ERIC GRANT
United States Attorney
JASON HITT
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:26-CR-0053-DAD |
| Plaintiff, | GOVERNMENT'S MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S ORDER AUTHORIZING PRETRIAL RELEASE FOR DEFENDANT CARLOS MENDOZA HERNANDEZ |
| v. | |
| CARLOS MENDOZA HERNANDEZ, | |
| Defendant. | |

The United States of America, by and through its attorney, Assistant United States Attorney

Jason Hitt, moves pursuant to 18 U.S.C. § 3145(a) for revocation of the April 14, 2026 ruling by United

States Magistrate Judge Claire authorizing the pretrial release of defendant Carlos Mendoza Hernandez.

ECF 7.

This motion is based upon the attached Memorandum of Points and Authorities, Exhibit A, incorporated here by reference, and any evidence and argument which may be presented at a hearing on this matter.

Dated: April 16, 2026

ERIC GRANT
United States Attorney

By:  /s/ *Jason Hitt*
JASON HITT
Assistant United States Attorney

ERIC GRANT
United States Attorney
JASON HITT
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:26-CR-0053-DAD |
|---|---|
| Plaintiff, | GOVERNMENT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S ORDER AUTHORIZING PRETRIAL RELEASE FOR DEFENDANT CARLOS MENDOZA |
| v. | |
| CARLOS MENDOZA HERNANDEZ, | |
| Defendant. | |

## I.     RELIEF SOUGHT

Pursuant to 18 U.S.C. § 3145(c), the United States, by and through Assistant United States Attorney Jason Hitt, moves to revoke the Magistrate Judge's Order of April 14, 2026, releasing defendant Carlos Mendoza Hernandez ("defendant" or "Mendoza Hernandez") on an unsecured bond when the defendant is charged with assaulting federal agents with a deadly weapon – a crime that is a crime of violence. The United States seeks an Order finding that the defendant is a flight risk and danger to the community, and, therefore, he should remain detained pending trial.

GOVERNMENT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR REVOCATION OF RELEASE ORDER

## II. SUMMARY OF ARGUMENT

This Court should revoke the Order granting defendant's pretrial release because the Bail Reform Act recognizes that crimes of violence warrant close scrutiny when determining whether conditions of release are appropriate. Here, Mendoza Hernandez is charged with a crime of violence based upon three separate dangerous, volitional acts of using his car to drive at other human beings in order to escape a law enforcement traffic stop. Once free, he drove the wrong way against traffic and hit another vehicle. Mendoza Hernandez did these things after he disregarded repeated requests for compliance and minutes of explanation provided to him in his native Spanish language about why he was stopped and what agents needed him to do. The defendant's actions endangered the lives of four law enforcement officers who stood outside of his rapidly accelerating vehicle and of people driving to work on the morning commute. The release order disregarded the concerns articulated by the Pretrial Services Officer who recommended detention, and it gave no weight to the factors required to be considered by 18 U.S.C. § 3142(g). The conditions of release – an unsecured $50,000 bond signed by the defendant's significant other – provide no meaningful assurance of his future appearances and in no way protect the community. In short, this Court should find the defendant presents a flight risk and danger based upon the core facts alleged in the Criminal Complaint because they cannot be separated from a determination about the defendant's pretrial detention status.

## III. DETENTION HISTORY

**April 14, 2026 – Magistrate Judge Claire Orders Defendant Released**

On April 14, 2026, the defendant made his initial appearance in the Eastern District of California on the government's Criminal Complaint charging him with assault on federal officers with a deadly or dangerous weapon in violation of 18 U.S.C. § 111(b). ECF 7. During a detention hearing before Magistrate Judge Claire, the government moved for detention on the basis of flight risk and danger; the Court was obligated to hold a detention hearing because Mendoza Hernandez is charged with a crime of violence. 18 U.S.C. § 3142(f)(1)(A) (requiring that a Court "shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community" where it is involves a "crime of violence."); *United States v. Juv. Female*, 566 F.3d 943, 947 (9th Cir.

2009) (holding that 18 U.S.C. § 111(b) is categorically a crime of violence); *accord United States v. Broadbent*, 2023 WL 6963438, at *2 (E.D. Cal. Oct. 20, 2023); *United States v. Arellano-Mendoza*, 2025 WL 253300, at *1 (E.D. Cal. Jan. 21, 2025). The Pretrial Services Officer recommended detention because the defendant fled at the time of his arrest and allegedly "hit an officer with his vehicle prior to his arrest." This commonsense recommendation is grounded in the facts detailed in the Criminal Complaint and the subsequent search warrant, which provides significant additional information demonstrating that Mendoza Hernandez initiated his escape efforts only after minutes of conversation with an agent and only after he placed his running car in drive, hit the gas pedal, and moved his car into the body of an agent at the front of his car. *See* Govt. Ex. A (rollover search warrant in Case No. 2:26-sw-0331-AC).

During the hearing, Magistrate Judge Claire ruled that, even if the Court took "the allegations of the affidavit in support of the complaint at face value, I don't think those allegations support the inference that Pretrial Services and the Government urge that this Defendant poses a danger to the community generally outside the unique circumstances of this event or that he presents a serious risk of non-appearance." Govt. Ex. B at 7. Ultimately, the Court's finding was that the facts of the case do not "support[] an inference of a desire to escape responsibility." Govt. Ex. B at 7. This finding cannot be reconciled with the facts detailed in the Criminal Complaint or the factors required for consideration under § 3142(g). The Court ordered Mendoza Hernandez released on a $50,000 unsecured bond and specifically rejected a request from Pretrial Services for location monitoring. Govt. Ex. B at 12. The Court agreed to stay the release order for 48 hours. Govt. Ex. B at 13–14.

## IV.     ANALYSIS

### A.     Standard of Review on a Motion to Revoke Magistrate's Release Order

A district court conducts a *de novo* review of a Magistrate Judge's pretrial detention ruling. *United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990). The district court is required to "review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference." *Id.* at 1193. If the performance of the district court's function "makes it necessary or desirable for the district judge to hold additional evidentiary hearings, it may do so, and its power to do so is not limited to occasions when evidence is offered that

was not presented to the magistrate." *Id.* at 1193.

**B.** **Applicable Detention Statutes for a Federal Crime of Violence**

Congress empowered judicial officers to release or detain defendants pending trial. 18 U.S.C. § 3141(a). Detention determinations proceed pursuant to the terms of 18 U.S.C. § 3142. Where, as here, the charged crime is a crime of violence, 18 U.S.C. § 3142(f)(1)(A) requires that the Court "shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(1)(A).[1]

**1.** Flight Risk Standard – Preponderance of the Evidence

Whether to detain a defendant as a flight risk pending trial is made by a preponderance of the evidence. *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985).

**2.** Danger to the Community Standard – Clear and Convincing Evidence

"A finding that a defendant is a danger to any other person or the community must be supported by 'clear and convincing evidence.'" *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008).

**C.** **Statutory Detention Factors – 18 U.S.C. § 3142(g)**

Under § 3142(g), the Court considers four factors in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(g). The four factors are: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug or alcohol abuse; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release." 18 U.S.C. §§ 3142(g)(1)–(4). As discussed, each statutory factor favors pretrial detention on grounds of both flight risk and danger.

---

[1] The charge in the Criminal Complaint – 18 U.S.C. § 111(b) – is a crime of violence. *Juv. Female*, 566 F.3d at 947, *Broadbent*, 2023 WL 6963438, at *2; *Arellano-Mendoza*, 2025 WL 253300, at *1. The Bail Reform Act defines "crime of violence" in 18 U.S.C. § 3156(a)(4) for purposes of the definition in § 3142(f)(1)(A) as the same as that applicable "elements" clause addressed in *Juvenile Female* (18 U.S.C. § 16) and *Broadbent* (18 U.S.C. § 924(c)(3)).

1. <u>The nature and circumstances of the offense include Mendoza Hernandez violently accelerating his car at the bodies of other human beings, jumping a concrete median as he fled, and hitting another vehicle in his path of flight.</u>[2]

This factor supports detention. On the morning of April 7, Mendoza Hernandez engaged in multiple volitional acts to threaten the safety of federal law enforcement agents in direct contradiction of lawful commands to exit his car. Driving requires at least three coordinating acts: steering, acceleration, and shifting in order to establish direction. Here, based on the video evidence and witness accounts, after more than 3 minutes of leaving his engine running, claiming that he needed to call his wife before exiting, and generally not complying with requests to exit his car, Mendoza Hernandez intentionally steered his vehicle into the body of Agent 1 while accelerating forward (requiring him to shift from park to drive). Mendoza Hernandez then shifted into reverse, steered the wheel to escape, and accelerated rapidly in reverse, colliding violently with a parked F-150 behind – this action caused his passenger door to nearly be ripped off its hinges. Then, Mendoza Hernandez again shifted into drive, steered the wheel dramatically to the left at or near the body of a federal agent and then accelerated rapidly toward the body of the agent. Mendoza Hernandez accelerated over a concrete and rock median. Mendoza Hernandez then drove against traffic going the wrong way and smashed into a vehicle headed in the opposite direction before returning to the correct lane.

Each of these facts demonstrates that the nature and circumstances of the offense are a crime of violence and that detention is appropriate.

---

[2] The United States incorporates by reference the sworn facts included in the Criminal Complaint affidavit, and the more robust facts detailed in the Search Warrant affidavit filed in Case No. 2:26-sw-0331-AC.



*Figure 1 – Traffic camera captures Mendoza Hernandez's Toyota cross intersection heading to Sperry Avenue at 6:23 a.m.*

        2.    <u>Facts and timeline of stop and Mendoza Hernandez's non-compliance and flight</u>

Mendoza Hernandez's conduct during the traffic stop consisted of prolonged non-compliance before he drove his car into the body of Agent 1. As shown in Figure 1 above, Mendoza Hernandez's car is captured by a traffic camera time stamped at 6:23 a.m. on April 7, with an agent's Ford F-150 displaying its red emergency visor lights illuminate to initiate the traffic stop. Mendoza Hernandez pulls his Toyota over a short time after this screen capture and Agent 1 initiates contact at the driver's side of Mendoza Hernandez's car on the driver's side. According to Agent 1, during the first contact with Mendoza Hernandez Agent 1 identified himself/herself and explained he/she worked for immigration. Agent 1 asked for Mendoza Hernandez's driver's license, which he provided. Based on the driver's license and observation of Mendoza Hernandez's physical appearance, Agent 1 was able to positively identify Mendoza Hernandez as the person they were trying to locate and arrest for being illegally present in the United States. The initial contact between Agent 1 and Mendoza Hernandez occurred in English, but the conversation then switched to Spanish, which Agent 1 speaks fluently. Video footage from a second Tesla in the area at the time of the stop establishes that Mendoza Hernandez and the agents were stopped by approximately 6:24 a.m.

During the initial part of the stop, Mendoza Hernandez rolled the front driver's side window approximately one-third of the way down. For approximately two to three minutes, Agent 1 and Mendoza Hernandez had a back-and-forth exchange in what Agent 1 described as communication going in "circles." This back-and-forth exchange pattern featured Agent 1 instructing Mendoza Hernandez to get out of the vehicle, Mendoza Hernandez not complying and, instead, responding that he wanted to call his wife before exiting the vehicle. Agent 1 told Mendoza Hernandez that he could indeed call his wife but, first, he would need to comply by getting out of his car. Agent 1 explained that, once Mendoza Hernandez exited his car, he could then speak to his wife. However, Mendoza Hernandez refused to comply for a period of what Agent 1 estimated to two to three minutes. It became evident to Agent 1 that Mendoza Hernandez was intentionally not complying with Agent 1's requests.

Near the end of the two-to-three minute exchange, Agent 1 noticed that Mendoza Hernandez began surveying his surroundings. In Agent 1's experience, Mendoza Hernandez's behavior was consistent with Mendoza Hernandez preparing himself to flee by looking to identify a path of escape. During the earlier portion of the two-to-three minute exchange, Agent 1 did not observe Mendoza Hernandez making any similar efforts to look around.

During the latter portion of this timeframe in the stop, Agent 1 instructed Agent 3, whose black Nissan Pathfinder was parked directly in front of the car, to reverse his/her vehicle so that it would eliminate the space between the front bumper of Mendoza Hernandez's car and the rear of Agent 3's vehicle. This was done to discourage Mendoza Hernandez from fleeing because, from Agent 1's perspective, Mendoza Hernandez was manifesting significant signs of non-compliance and shifting to behavior consistent with an impending attempt to flee. Agent 3, who was on the passenger side of the car walked around toward the black Pathfinder, entered his/her vehicle, reversed the vehicle to approximately one foot from Mendoza Hernandez's front bumper, exited the vehicle, and walked back to the passenger side of the car to re-establish his/her position.

Agent 1's observation and request for Agent 3 to reposition the Pathfinder, which is consistent with what Agent 4 recounted during an interview with FBI, demonstrates how long Mendoza Hernandez's non-compliance with Agent 1's commands was prolonging the stop. Given that Agent 3 had time to reposition the Pathfinder in front of Mendoza Hernandez's car while the stop was still

7

unresolved and ongoing after two-to-three minutes underscores that Mendoza Hernandez had ample opportunity to turn off his vehicle, exit the car, and deal with the agents. But, he did not.

According to Agent 2, after approximately the second minute of dialogue between Agent 1 and Mendoza Hernandez, Agent 2 gestured to Agent 1 and asked, "Do you want me to pop it?" Agent 2 explained that "pop[ping] it" referred to breaking the glass of the front passenger side window in an effort to open the door and extract Mendoza Hernandez. At that point, Agent 1 waved off Agent 2 and declined the offer – Agent 2 understood Agent 1 to mean that Agent 1 wanted to continue a dialogue with Mendoza Hernandez to see if he would become compliant.

According to Agent 1, based upon Mendoza Hernandez's prolonged non-compliance, agents ultimately decided they would extract Mendoza Hernandez from his car. To effectuate the extraction, Agent 1 moved his/her body's position further to the front of the car, leaning on the front driver's side fender facing Mendoza Hernandez. At this time, Agent 1 drew his/her firearm and pointed it through the front windshield downwards towards the lap area of Mendoza Hernandez. Agent 1 took this position to establish better officer presence,[3] obtain a better view of Mendoza Hernandez, to see Mendoza Hernandez's hands, provide coverage to his/her colleagues in case lethal force was used, and to ensure an angle to minimize the crossfire with his/her colleagues if they had to discharge their firearms. Agent 1 explained that his/her drawing of his/her firearm and positioning at the front driver fender were not done with an intention to discharge his/her firearm. According to Agent 1, his/her finger was not on the trigger of the firearm but, instead, was placed on the "side rail."

According to Agent 1, Agent 3 proceeded to use a window punch to break the front passenger window. Agent 1 heard the breaking of the glass and opening of the front passenger door. Agent 1 saw broken glass in his/her periphery. Around this time, Agent 1 saw Mendoza Hernandez suddenly reach for the shifter. Agent 1 repeatedly instructed him, "Don't move." Agent 1 heard Mendoza Hernandez revving the car's engine by pressing down on the vehicle's gas pedal. When Agent 1 heard Mendoza Hernandez revving the engine, the car was stationary because Mendoza Hernandez had not shifted the

---

[3] Officer presence is a term used by law enforcement officers to describe visible, authoritative appearance and demeanor of a law enforcement officer to influence behavior and help gain voluntary compliance without the use of force.

car into drive.  That quickly changed.  According to Agent 1, Mendoza Hernandez then shifted the car into drive and hit the gas pedal causing the car to surge forward approximately six to eight inches.  When Mendoza Hernandez drove the car forward, Agent 1's body was leaning on the front driver's side fender.  Mendoza Hernandez's sudden forward surge in the car caused Agent 1's body to be pushed off of the Toyota's front fender.

Agent 1's account of this initial surge by Mendoza Hernandez into his/her body is corroborated by video obtained from a driver in a white Tesla who was driving in a lane next to the traffic stop on Sperry Avenue.[4]  *See* Govt. Ex. C (under seal).  In the video, one can see Agent 1 leaning his body against the fender over the front windshield.  Mendoza Hernandez has the car's front tires facing forward.  Mendoza Hernandez's flashing hazard lights are visible but the brake lights are not activated.  This is consistent with Mendoza Hernandez having the car in "park" and the vehicle stationary.

As the Tesla gets closer to the stop in the video, Mendoza Hernandez's brake lights momentarily turn on consistent with Mendoza Hernandez placing his foot on the brake pedal.  This is most visible in the Mendoza Hernandez's center high-mounted stop lamp, most commonly known as the third brake light or high-mount brake light.

---

[4]  Video from the white Tesla is submitted under seal with this brief as Government Exhibit C.  A copy of Exhibit C will be lodged with the Clerk's Office to be delivered to Chambers in connection with this filing.  The government will also provide a copy of the video to defense counsel.

9



***Figure 2 – After Mendoza Hernandez fails to comply with agent directives for at least 2-3 minutes, keeps his car running and then suddenly presses down on the brake pedal and shifts the car into drive – in the direct path of Agent 1 who is leaning on the front bumper. This most easily visible with the activation of Mendoza Hernandez's third brake light.***

Around the same time, Mendoza Hernandez turns his steering wheel to the left because the video shows the front driver's side wheel now turned to the left. Mendoza Hernandez then accelerates forward causing the car to surge into Agent 1's body and to the left. Mendoza Hernandez surged his car forward between six inches and one foot. The video shows Mendoza Hernandez's action in driving the car forward causes Agent 1 to be pushed off the vehicle and moved backwards. Based on review of the Tesla video, FBI estimates that Mendoza Hernandez first surged his car forward at approximately 6:28 a.m.



*Figure 3 – Mendoza Hernandez has now released the brake pedal, shifted into drive, turned the steering wheel to his left, pushed the accelerator pedal and caused his car to surge the car forward into the body of Agent 1. Note that Mendoza Hernandez's brake lights are no longer visible because he is pushing the accelerator. Agents had not fired any weapons at this point in the stop.*

As detailed in the video and in the statements of agents present during the stop, no agent fired his/her weapon before Mendoza Hernandez caused the car to surge forward into Agent 1's body. After Mendoza Hernandez drove the car forward into Agent 1, Agent 1 discharged approximately two shots; one was shot low because the firearm was originally angled downwards for officer safety and the other shot was aimed approximately at Mendoza Hernandez's upper center of mass. At this time, Agent 1 did not hear any other agents discharge their firearms. Agent 1, fearing for his/her life and those of his/her colleagues shot Mendoza Hernandez in order to stop Mendoza Hernandez's forward surge in the car. According to Agent 1, he/she shot believing that the continual movement of the vehicle would pose a danger to Agents 2 and 3, who were on the passenger side where the front passenger door was open. The open door would pose a risk of dragging the agents along while Mendoza Hernandez drove the car. Agent 1 believed that Mendoza Hernandez surged the vehicle forward in order to effectuate an escape.

Immediately after surging his car forward, Mendoza Hernandez then shifted the car into reverse. Mendoza Hernandez then pressed down on the accelerator rapidly and caused the rear of his vehicle to swerve dramatically into the street. Agent 1 heard Mendoza Hernandez revving the engine up as he shifted the car into reverse. Mendoza Hernandez's actions caused the car to move backward quickly and

caused a violent collision when Mendoza Hernandez smashed his car the front of Agent 1's F-150, pinning the front passenger door between the F-150. Mendoza Hernandez's actions caused the car's passenger door to "flatten out," meaning open all the way toward the front of the car as far as the hinges could reach without the door being ripped off.



*Figure 4 –Mendoza Hernandez has now shifted the Toyota into reverse and pushed the accelerator pedal causing his car to surge backward into the front end of the agent's Ford F-150. Note that Mendoza Hernandez's brake lights are not activated because he is pushing the accelerator.*



*Figure 5 –Mendoza Hernandez has smashed his Toyota into the front of the agent's Ford F-150. Note that Mendoza Hernandez's reverse lights are visible as he accelerates quickly backward by pushing the accelerator.*

After Mendoza Hernandez smashed the back of his car into the front of the F-150, he paused for a moment. Agent 1 waited and "reassessed" to see what Mendoza Hernandez would do next. In the moment, Agent 1 wondered whether Mendoza Hernandez would continue backing up, or if the vehicle was inoperable, or whether Mendoza Hernandez was fatally wounded. Mendoza Hernandez decided to shift his car from reverse back into drive, press down hard on the gas pedal, and speed forward directly into the path of the agents. In the video, during the momentary pause, Agent 1 visibly lowers his/her firearm as he/she reassesses what Mendoza Hernandez may do next. Agent 1 then raises his firearm aiming it in the direction of Mendoza Hernandez as the car begins to lurch forward.

At the moment Mendoza Hernandez drove his car forward, both Agents 1 and 2 were in the direct path of the car's travel – their bodies were positioned between the front of Mendoza Hernandez's car and the back of Agent 3's black Pathfinder. According to Agent 1, he/she did not want Mendoza Hernandez to drive his car into Agent 1's body and cause Agent 1 to be crushed between the car and the Pathfinder. Accordingly, Agent 1 quickly moved to his/her right to get out of Mendoza Hernandez's path of flight. Agent 1 heard Mendoza Hernandez revving the car's engine and saw the car's front

wheels were now turned at an extreme angle to the left in a path that would take Mendoza Hernandez's car directly into Agent 1's body. Agent 1 believed that Mendoza Hernandez wanted to run down the agents with his car based on the wheel angle and the speed with which he was accelerating to move the car forward in such close proximity to the agents.[5]



*Figure 6 –Mendoza Hernandez accelerates forward, rapidly turning the steering wheel dramatically to his left toward the body of Agent 1. Mendoza Hernandez's leftward forward acceleration toward Agent 1 carries him over the concrete and rock median.*

When Mendoza Hernandez accelerated his car forward toward Agent 1's body, Agent 1 shot five-to-six rounds while side-stepping to the right out of the path of the moving vehicle. According to Agent 1, had he/she not moved out of the path of Mendoza Hernandez's vehicle and fired those shots, he/she would have been run over by Mendoza Hernandez's car. The Tesla video confirms this assessment.

Having fled the scene of the stop, Mendoza Hernandez continued driving, jumped the center

---

[5] By looking for signs of muzzle blasts from the agents' discharging of their firearms in the Tesla video, a careful review shows that the first observable muzzle blast occurred just after the black Toyota surges forward into Agent 1's body. A second muzzle blast occurred immediately after Mendoza Hernandez shifted his car into reverse and accelerated backward. As Mendoza Hernandez continued reversing before he hit the F-150, there is a third muzzle blast visible and, immediately after, a long piece of black trim flies up from the Toyota getting thrown approximately ten feet into the air. Agent 1 then gets blocked by the path of the black Toyota with Agent 1 reappearing with his/her firearm lowered.

concrete and rock median, and entered the opposite lanes of traffic. While on the opposite side of Sperry Avenue, the impact of crossing the median caused two of the vehicle's hubcaps to fly off into the roadway.



***Figure 7 – Mendoza Hernandez accelerates forward, jumps the concrete and rock median, and continues up Sperry Avenue in the wrong direction and strikes another car.***

While on the opposite side of Sperry Avenue, the impact of crossing the median caused two of Mendoza Hernandez's hubcaps to fly off into the roadway. He continued driving the wrong way up Sperry Avenue toward the freeway. On this side of the road, Hernandez Mendoza's vehicle collided with another vehicle and struck a guardrail before crossing back into the correct lane of traffic and coming to rest approximately 500 feet from the traffic stop on the right shoulder of the westbound lanes.

Agents entered their vehicles and drove to the final location of Mendoza Hernandez's car. They took Mendoza Hernandez out of the vehicle and rendered first-aid before emergency personnel transported Mendoza Hernandez to a local hospital.

Given these facts, Mendoza Hernandez presents both a flight risk and danger, and thus detention pending trial is appropriate and supported by the nature and circumstances of the charged crime of violence.

### 3. The weight of the evidence against Mendoza Hernandez is overwhelming[6]

This factor favors detention. The evidence against Mendoza Hernandez comes from multiple

---

[6] The United States recognizes the unique Ninth Circuit holding that the weight of the evidence is the least important factor to the detention analysis, but the Court should certainly consider the evidence factor in reaching its decision. *Motamedi*, 767 F.2d at 1405; *but see United States v. Ward*,

GOVERNMENT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR REVOCATION OF RELEASE ORDER

forms of video captured by vehicles traveling near the scene of the stop, traffic camera footage, and the consistent testimony of four eyewitnesses to Mendoza Hernandez's conduct on April 7.

### 4. History and characteristics of Mendoza Hernandez[7]

This factor supports detention because Mendoza Hernandez was not candid with Pretrial Services in his interview on at least two material and significant topics: use of controlled substances and gang affiliation. Moreover, Pretrial Services knows very little about Mendoza Hernandez's history in the United States, or the place where he spent most of his life: El Salvador. On that point, Mendoza Hernandez does not have long-standing ties to Patterson, having lived there only about 2 years after moving from Hayward.

### a. Misrepresentation about use of controlled substances

In his Pretrial interview, Mendoza Hernandez claimed that he last used marijuana about six years earlier (presumably when he still lived in El Salvador). He also denied to Pretrial Services that he used any other illegal substances. This denial does not match evidence from the hospital where medical personnel treated Mendoza Hernandez after the incident.

In particular, a routine urine drug screen administered by the hospital at approximately 10:03 a.m. on April 7 revealed that Mendoza Hernandez tested positive for cocaine and opioids in his system. Govt. Ex. D (under seal). The positive results occurred based upon collection of Mendoza Hernandez's urine a few hours after he arrived at the hospital. This means, at a minimum, that Mendoza Hernandez was not truthful with the Pretrial Services Officer when he denied the use of any illegal substances because he tested positive for cocaine within hours of the traffic stop.[8]

---

63 F. Supp. 2d 1203, 1208 n.6 (C.D. Cal. 1999) (explaining origin of *Motamedi* rule is an unsupported statement in pre-1984 Bail Reform Act case, *United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir. 1972)).

[7] This category includes consideration of the defendant's character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug or alcohol abuse. 18 U.S.C. § 3142(g)(3).

[8] According to a hospital official familiar with the lab results contained in Government Exhibit D, the positive result for opiates could result from an opioid being administered to Mendoza Hernandez as part of the treatment plan when he arrived at the hospital and before the urine sample was collected from him. By contrast, the positive cocaine result would only result from the presence of cocaine in Mendoza Hernandez's system.

### b. Misrepresentation about gang affiliation

In his Pretrial interview, Mendoza Hernandez denied any gang affiliation. However, as depicted below, Mendoza Hernandez has a tattoo on his chest that is consistent with membership in a street gang. In addition, according to Spanish language records provided to FBI from El Salvadoran law enforcement, officials in El Salvador identified Mendoza Hernandez as holding the status of "Homeboy" within a specific faction of the 18th Street criminal gang in El Salvador. This information is preliminary from El Salvadoran officials, but it corroborates the mark on his chest. FBI continues to seek additional law enforcement and judicial records and have them translated as they are received.



*Figure 8 – Mendoza Hernadez's chest has a tattoo of an "X" and "8" consistent with the number "18"*

### c. Mendoza Hernandez's conviction for aggravated extortion in El Salvador

Because Mendoza Hernandez spent most of his life in El Salvador (arriving in the United States in approximately 2020 at the age of 31), the FBI continues to investigate his background and activities in El Salvador. As a preliminary result of that investigation, agents learned that El Salvadoran authorities prosecuted Mendoza Hernandez on various charges with a resulting conviction for aggravated extortion in 2010. According to El Salvadoran penal records, Mendoza Hernandez was admitted to

Quezaltepeque Penitentiary, Sector 1, Cell 3, for the crime of aggravated extortion on January 27, 2010. The same record reports that Mendoza Hernandez released from prison on this conviction on or about July 20, 2015.

> d. <u>Pretrial Services has very limited information about Mendoza Hernandez's time in the United States or in El Salvador</u>

Mendoza Hernandez has little connection to the United States and lacks a robust footprint here. Based on the sparse timeline outlined in the Pretrial Services biographical section, he lived with relatives in Hayward for about two years (2020–22), and then moved to Patterson with his significant other about three years ago. His reported work history is limited to "various jobs" with no verification of such employment provided to Pretrial Services. He has a bank account but doesn't know its balance. He has no other assets. In short, Mendoza Hernandez lived the majority of his life in El Salvador; his ties to Patterson are relatively limited in the overall time he has been alive. Given the many unknowns in Mendoza Hernandez's life, background, and activities in El Salvador and his limited time living in the United States, the government believes his history and characteristics support detention pending trial.

## V.    **CONCLUSION**

For the reasons set forth in this motion, the attached and incorporated Exhibits, and any evidence or argument presented at a hearing on this motion, this Court should revoke the revoke the Magistrate Judge's Order of April 14, 2026, releasing the defendant, and the Court should instead order the defendant detained as a flight risk and danger to the community.

Dated:  April 16, 2026

ERIC GRANT
United States Attorney

By:  /s/ *Jason Hitt*
JASON HITT
Assistant United States Attorney