**Government Exhibit A**
**Search Warrant Affidavit in Case No. 2:26-sw-0331-AC**

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

FILED

Apr 14, 2026

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

In the Matter of the Search of

One black Toyota C-HR, CA 8WVR114, currently secured at the FBI Sacramento Division office located at 2001 Freedom Way, Roseville, California; and

One black cell phone recovered on the south sidewalk of Sperry Ave near the incident scene believed to have belonged to Carlos Ivan Mendoza Hernandez, currently secured at the FBI Sacramento Division office located at 2001 Freedom Way, Roseville, California.

Case No. 2:26-sw-0331 AC

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENTS A-1 and A-2, attached here and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENTS B-1 and B-2, attached here and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 111(b) | Assault on federal officer with dangerous or deadly weapon |

The application is based on these facts:

**SEE AFFIDAVIT, attached here and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Brian Toy

*Applicant's signature*

FBI Special Agent Brian Toy
*Printed name and title*

Sworn to me and signed telephonically.

Date: April 14, 2026

City and state: Sacramento, California

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

ERIC GRANT
United States Attorney
JASON HITT
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of: | CASE NO. |
|---|---|
| One black Toyota C-HR, CA 8WVR114, currently secured at the FBI Sacramento Division office located at 2001 Freedom Way, Roseville, California; <br><br> One black cell phone recovered on the south sidewalk of Sperry Ave near the incident scene believed to have belonged to Carlos Ivan Mendoza Hernandez. | AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT |

I, Brian Toy, being first duly sworn, hereby depose and state as follows:

## I. PURPOSE

1. This affidavit is made in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search authorizing the examination of property – the below-identified items (Attachments A-1 and A-2) – which are currently in law enforcement possession, and the seizure of the items or data that property is described in Attachment B-1 and B-2.

- One black Toyota C-HR, CA 8WVR114, driven by Carlos Ivan Mendoza Hernandez on April 7, 2026, during a traffic stop in Patterson, California, described in further detail in Attachment A-1.

- One black cell phone recovered on the south sidewalk of Sperry Avenue, Patterson, California, near the incident scene believed to have belonged to Carlos Ivan Mendoza Hernandez, described in further detail in Attachment A-2.

2. Both items are currently in the custody of the FBI in Roseville, California, and are

1

described more particularly in Attachment A-1 and A-2, which is attached and incorporated here by reference.

3. Based on the information provided in this affidavit, it is my opinion that there is probable cause to believe that Carlos Ivan Mendoza Hernandez violated of 18 U.S.C. § 111(b) (assault on a federal officer with a deadly or dangerous weapon), as detailed below. On April 9, 2026, the Honorable Allison Claire issued a sealed Criminal Complaint and arrest warrant for Mendoza Hernandez for a violation of 18 U.S.C. § 111(b) in *United States v. Hernandez*, Case No. 2:26-mj-0040-AC. That Criminal Complaint is now unsealed. Based upon my investigation to date, I further believe that there is probable cause to search the items described in Attachment A-1 and A-2 for evidence of this crime as further described in Attachment B-1 and B-2.

## II. INTRODUCTION AND AGENT BACKGROUND

4. This affidavit is submitted to establish probable cause that, on or about April 7, 2026, at approximately 6:50 a.m., within the Eastern District of California, defendant Carlos Ivan Mendoza Hernandez violated 18 U.S.C. § 111(b) by assaulting, resisting, and impeding federal officers and employees while engaged in official duties with a dangerous or deadly weapon. Specifically, Mendoza Hernandez refused to comply with lawful orders from federal officers, operated his vehicle in a manner that damaged a federal vehicle, and drove his vehicle toward officers in a manner that would have caused serious bodily injury, or death had the officers not taken evasive action.

5. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been employed since May 2010. I graduated from the FBI Academy in Quantico, Virginia, in October 2010, where I received training in investigative techniques, including conducting criminal investigations, executing search and arrest warrants, and seizing evidence of violations of United States law. I am currently assigned to the FBI's Sacramento Field Office, Stockton Resident Agency, where I have participated in investigations involving violent crime, firearms offenses, narcotics violations, murder-for-hire, serial killings, bank robbery, and extortion. I have received training and gained experience in interviewing and interrogation, arrest procedures, physical surveillance, search warrant preparation and execution, and the seizure and analysis of electronic evidence, including social media. I have testified before federal grand juries and executed search and arrest warrants.

6. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### III. PROBABLE CAUSE[1]

**A. Summary of events on April 7, 2026**

7. On or about April 7, 2026, four federal law enforcement officers conducted an operation in the city of Patterson, California, Stanislaus County, to locate, and arrest Mendoza Hernandez for immigration violations. Three officers were with Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), and one was an employee of Customs and Border Protection (CBP). These officers are referred to here as Agents 1 through 4. Agents 1, 2, and 3 are ERO officers while Agent 4 is a CBP officer.

8. Early on the morning of April 7, the team established surveillance at Mendoza Hernandez's residence in Patterson. Patterson is a city located in Stanislaus County which is in the Eastern District of California. The purpose of the operation was to locate and arrest Mendoza Hernandez because he is an illegal alien with no status in the United States. In the driveway of the residence, agents observed a black Toyota C-HR parked in the driveway. The Toyota C-HR displayed California license plate number 8WVR114, which the officers believed was Mendoza Hernandez's vehicle based on intelligence gathered prior to the operation. The registered owner of the vehicle is a C.M. with a registration address at the residence where agents observed the Toyota C-HR. At approximately 6:40 a.m., Agent 4 observed a male, later identified as Mendoza Hernandez, drive off in the C-HR.

9. Officers followed Mendoza Hernandez as he traveled westbound on Sperry Avenue toward Interstate 5. A short time after passing Roger Road, Agent 1 activated his/her emergency lights to initiate a traffic stop. Mendoza Hernandez pulled over on the right shoulder.

---

[1] The following summary of probable cause is the product of interviews conducted of four agents who participated in the traffic stop as well as my review of a white Tesla motorist's dashboard camera footage posted to the website of a Sacramento news outlet. The dashboard camera video posted to the news website shows portions of the car stop and subsequent events as the stop unfolds. I subsequently obtained high-resolution video from the white Tesla from the vehicle's owner. I also reviewed a second dashboard camera video from a second vehicle on the scene that was posted to the website of CNN. This video is from the vehicle behind a white Tesla and it shows the car stop and its events.

Agents parked a brown Ford F-150 directly behind Mendoza Hernandez's vehicle, and Agent 3 positioned his/her vehicle in front of Mendoza Hernandez's vehicle with rear emergency lights activated.

10. Agent 1 approached Mendoza Hernandez on the driver's side identifying him/herself as an ICE agent. As detailed more below, three of the agents were wearing exterior clothing that identified themselves as being law enforcement agents or as "POLICE." They did not have masks concealing their faces during the stop. As the stop unfolded, Agent 4 was behind Agent 1 on the driver's side. Agents 2 and 3 positioned themselves on the passenger side of the vehicle. The driver identified himself as Mendoza Hernandez. Agent 4 also identified Mendoza Hernandez based on unique features of his "big ears" which were consistent with the photo of him that was obtained prior to the operation. Agent 1 informed Mendoza Hernandez that he was being detained and instructed him to step out of the vehicle. The conversation between Agent 1 began in English but switched to Spanish when Agent 1 noticed that Mendoza Hernandez responded in Spanish. Agent 1 speaks Spanish.

11. Agent 4 recalled that Agent 1 had instructed Mendoza Hernandez "a lot of times" and that the conversation was going in circles. Agent 4 also stated that at no time during the encounter did Mendoza Hernandez express that he did not believe the officers were who they presented themselves to be. Despite repeated lawful commands, Mendoza Hernandez refused to comply with the agent's requests. A number of minutes passed while Agent 1 requested Mendoza Hernandez's compliance but was unsuccessful. Agent 1 advised him that his concerns could be addressed before a judge, but Mendoza Hernandez continued to refuse to comply with the requests of Agent 1.

12. During the encounter, agents also informed Mendoza Hernandez that they may have to break the window of his vehicle and extract him out of the vehicle. Due to his continual refusal to comply with repeated audible commands to step out of the vehicle, Agent 2, acting in a supervisory role, authorized extraction of Mendoza Hernandez from the vehicle. To effectuate that extraction, Agent 3 broke the front passenger window of Mendoza Hernandez's vehicle. At around the same time, Mendoza Hernandez placed the vehicle in drive moving the vehicle forward and to the left approximately one foot hitting Agent 1. Hernandez Mendoza then quickly shifted the vehicle in reverse and abruptly forced the vehicle in a rapid backward motion in what agents understood to be an attempt

4

to flee. With the front wheels turned left, the vehicle moved backward sharply and collided with the front bumper area of the agents' F-150 parked behind Mendoza Hernandez, forcing Mendoza Hernandez's front passenger door to bend beyond its normal range and causing significant damage to the passenger door, as shown in Figures 1 and 2 below.



*Figure 1 –Hernandez Mendoza's vehicle begins rapid backward reverse action with vehicle's reverse tail lights visible.*



*Figure 2 – After rapid reverse acceleration, Hernandez Mendoza's vehicle struck the front bumper area of the agents' Ford F-150, forcing the passenger door open and causing damage to the door.*

13. After striking the front of the agents' Ford F-150, Hernandez Mendoza's vehicle rotated more than 45 degrees, facing Agent 1 and Agent 2. After a brief pause, Mendoza Hernandez then shifted into drive and accelerated forward toward Agents 1 and 2, as shown in Figure 3 below. Agent 1 was in the direct path of Mendoza Hernandez's vehicle and thus moved to his/her right to avoid

5

being struck by the approaching vehicle driven by Mendoza Hernandez.



*Figure 3 – Hernandez Mendoza begins to reverse his vehicle to make an escape.*

14. Based on my training and experience, and after reviewing relevant video evidence from the encounter, I believe that if Agent 1 had not moved, he/she would have been struck by Mendoza Hernandez and would have suffered serious bodily injury or death.

15. During this incident, Agents 1 and 2 discharged their firearms at Mendoza Hernandez. On April 7, 2026, Agent 4 provided details of the circumstances surrounding the shooting from his/her account. As such, your affiant is disclosing this to the Court to provide context. Agent 4 stated that it was not until after Agent 3 broke the front passenger windshield that Agents 1 and Agent 4 drew their guns. After the breaking of the window, Mendoza Hernandez drove his vehicle to the front left, striking Agent 1 and Agent 3's vehicle.[2] It was around this time that Agent 1 discharged his/her firearm. There was a brief pause from the shooting as Mendoza Hernandez appeared to have been shot and stopped. However, Mendoza Hernandez again moved his vehicle, pulling out. This time both Agents 1 and 2 discharged their firearms. Agent 4 did not discharge his/her firearm due to Agent 4

_____

[2] I examined the rear of Agent 3's vehicle after the incident. It did not appear there was damage to the vehicle. This is not necessarily contradictory to Agent 4's account; rather, it serves to clarify the current facts and statements known to me. The account of Mendoza Hernandez striking Agent 1 is consistent with video evidence that I have reviewed. The video appears to show Mendoza Hernandez moving his vehicle to the front left for about the distance of one foot, striking Agent 1. Agent 4 could not recall Mendoza Hernandez backing up his vehicle. However, video evidence of the incident demonstrates that Mendoza Hernandez did indeed back up his vehicle causing damage to his vehicle and damage to the agents' Ford F-150.

observing a crossfire situation between him/her and Agent 3.

16. Agent 3 provided a similar account. Agent 3 noted that Mendoza Hernandez refused to follow instructions from Agent 1 about turning off his vehicle and stepping out of the vehicle.[3] After Agent 3 broke the front passenger side window, Agent 3 reached in to open the door from the inside. At this time, Mendoza Hernandez moved his vehicle, backing it up a little[4] to be able to pull forward to escape due to Agent 3's vehicle blocking the front of Mendoza Hernandez's vehicle. At that point, Mendoza Hernandez "gunned it," meaning he accelerated the vehicle. It was at this time that Agent 3 heard the gunshots. Agent 3 observed that when the vehicle was accelerating, Agent 1 was directly in front of the vehicle. Agent 1[5] "jumped out of the way." Agent 3's belief is that had Agent 1 not taken evasive action, Agent 1[6] would have been hit.

17. The investigation is ongoing as we continue to collect evidence and conduct additional interviews but, based upon the current evidence known to me at this time, I believe agents discharged their firearms in response to Mendoza Hernandez driving his vehicle striking Agent 1 and then attempted to flee – all of which posed an immediate threat of serious bodily injury or death to Agents 1 and 2. As such, I believe there is probable cause to believe that Mendoza Hernandez violated 18 U.S.C. § 111.[7]

18. Mendoza Hernandez continued driving, jumped the center median, and entered the opposite lanes of traffic, traveling westbound in the eastbound lanes of Sperry Avenue, as shown in Figure 4 below.

---

[3] During an April 10, 2026 interview of Agent 1, he/she stated that he/she did not instruct Mendoza Hernandez to turn off their vehicle.

[4] My review of video footage of the incident confirmed that Mendoza Hernandez backed his vehicle up a significant distance.

[5] In a prior affidavit, I incorrectly designated this individual as Agent 3 when it should have been Agent 1.

[6] In a prior affidavit, your affiant incorrectly designated this individual as Agent 3 when it should have been Agent 1.

[7] FBI has not interviewed Mendoza Hernandez about the incident on April 7, 2026. He was released from the hospital on April 13, 2026, and is currently in the custody of the FBI in preparation for making an initial appearance on the Criminal Complaint in this case.



*Figure 4 – As Hernandez Mendoza's vehicle accelerates forward, it veers left across Sperry Avenue and over the center stone median into traffic heading in the opposite direction.*



*Figure 5 – The force of crossing the stone median causes two hubcaps to fly off of Hernandez Mendoza's vehicle as he moves the wrong way against traffic on Sperry Avenue – a black object later determined to be a backpack ejects on to the street from Hernandez Mendoza's vehicle as indicated by the blue arrow above.*

19. While on the opposite side of Sperry Avenue, the impact of crossing the median caused two of the vehicle's hubcaps to fly off into the roadway. In addition, dashboard camera video shows a black object exit the open passenger door of Mendoza Hernandez's vehicle, as shown in Figure 5 above. Agents later discovered the black object was a Nike backpack.

20. Mendoza Hernandez's vehicle continued the wrong way up Sperry Avenue toward the freeway. On this side of the road, Hernandez Mendoza's vehicle collided with another

8

vehicle, struck a guardrail, and came to rest approximately 500 feet from the traffic stop on the right shoulder of the westbound lanes.

21. Officers entered their vehicles driving to the final location of the C-HR. Officers took Mendoza Hernandez out of the vehicle and rendered first-aid. Agent 2 called for emergency medical services. Personnel transported Mendoza Hernandez to a local hospital where he was treated by medical staff.

22. During his treatment at the hospital, Mendoza Hernandez spoke in Spanish to a deputy who also speaks and understands Spanish. Mendoza Hernandez provided some spontaneous statements. First, he asked the deputy why agents shot him. The deputy responded that he was not responsible for investigating the circumstances of the incident. Second, Mendoza Hernandez told the deputy that he (Mendoza Hernandez) had it (the incident) all on his dashcam. The deputy interpreted Mendoza Hernandez's comment to mean Mendoza Hernandez's vehicle recorded the circumstances of the stop and the subsequent shooting.

23. After the incident, I obtained photographs of Agents 1 through 4. The photographs show each agent wearing their body armor, duty belt, and any other outer clothing worn during the traffic stop. Below is a summary of the observations I was able to make:

- Agent 1 wore a green body armor vest displaying "POLICE" in black letters on the front. The back of the vest displayed "POLICE" in large yellow letters, with "ERO" in smaller letters below.
- Agent 2 wore a green body armor vest displaying "POLICE" in white letters on the front. In smaller letters below were the markings "DHS" and "ICE." The back of the vest displayed "POLICE" in large white letters, with "FEDERAL OFFICER" above and "FUGITIVE OPERATIONS" below in smaller lettering.
- Agent 3 wore a green body armor vest with a gold badge on the left chest displaying "ICE." The back of the vest displayed "ERO" in large gold letters.
- Agent 4 wore a black jacket with no visible law enforcement markings. However, Agent 4 wore a body armor vest underneath, with both the front and back displaying "POLICE." On Agent 4's upper left chest, affixed to the body armor, was a silver law enforcement badge. At

9

the time Agent 4 was photographed, his/her black jacket was unzipped, and the "POLICE" marking was visible; this is how video of the incident showed Agent 4. The back of Agent 4's body armor, which was concealed by the jacket, displayed "POLICE" in large white letters.

24. Based on my knowledge of this case, I know that Agent 1 made the majority of contact with Mendoza Hernandez during the traffic stop. Agent 1 was responsible for directly communicating with Mendoza Hernandez through the driver's side window. Accordingly, I believe that Agent 1's body armor vest, which clearly displayed "POLICE," would have been visible to Mendoza Hernandez during the encounter.

### B. White Tesla high-resolution video obtained on April 9, 2026

25. On or about April 9, 2026, I contacted the registered owner of the white Tesla which captured dashcam video of the incident. This video provided by the owner was video in a higher resolution than that I had previously observed. I will provide corroborating evidence from this video throughout the rest of this affidavit.

### C. Interview of Agent 2 on April 10, 2026

26. On or about April 10, 2026, during the interview with Agent 2, he/she stated that after agents contacted Mendoza Hernandez, he refused to comply with commands from Agent 1 to exit the vehicle. This refusal to comply lasted approximately two to three minutes with Mendoza Hernandez sitting in his vehicle refusing to exit. In Agent 2's experience, when a subject complies with commands to exit their vehicle, it would usually take approximately 15 to 20 seconds for the subject to exit the vehicle. In Agent 2's experience, after two minutes of non-compliance the effectiveness of verbal commands would have been exhausted. After approximately the second minute of dialogue between Agent 1 and Mendoza Hernandez, Agent 2 gestured asking Agent 1, "Do you want me to pop it?" Agent 2 explained that "pop[ping] it" referred to breaking the glass of the front passenger side window in an effort to open the door and extract Mendoza Hernandez. Agent 1 waved off Agent 2 and declined the offer – Agent 2 understood Agent 1 to mean that Agent 1 wanted to continue a dialogue with Mendoza Hernandez.

27. During the dialogue, Agent 2 observed Mendoza Hernandez, who had his hands

10

on the steering wheel and the engine running, move his right hand to reach for the shifter, also known as the gear shift lever. Agent 2 had called out the observation informing the rest of the team of Mendoza Hernandez's hand reaching for the shifter. The reaching for the shifter also occurred after Agent 1 had waved Agent 2 off from breaking the glass. Eventually, Agent 1, who was leaning on the vehicle with his right hand, took a step back and verbally instructed agents to break the glass. At this time, Agent 1 recalled that the vehicle's front tires were facing straight ahead.[8] Agent 3 on his/her second attempt was able to break the window of the front passenger seat. After the breaking of the window, agents on the passenger side reached into the vehicle, unlocking and opening the front passenger door. As soon as the door was opened, Agent 2 saw Mendoza Hernandez place his hand on the shifter. Agent 2 called out to his team, "This guy's about to break." According to Agent 2, he/she believed that Mendoza Hernandez was attempting to drive off in the vehicle to flee.

28.     Agent 2 observed that the vehicle was placed in reverse[9] and then drove backwards crashing into the front bumper of Agent 1's F-150. Mendoza Hernandez backed up his black Toyota with such force that the front passenger door (which was open) bent the wrong way all the way to the front passenger fender. Agent 2 described the rapid backward motion of the vehicle as "not normal" but "violent." Agents 2 and 3 were not hit by the vehicle. However, Agent 2 believed that when the vehicle reversed it passed by Agent 2 within one foot of Agent 2. My review of the white Tesla video confirmed events consistent with Agent 2's statements. As previously described, when Mendoza Hernandez reversed his black Toyota , the front wheels were turned to the left. As such, the vehicle backed up to the left moving its rear bumper to the left into the street. Due to the direction of the front tires, the vehicle's front passenger side fender swerved backwards and to the right. In the video, I was able to observe Agent 2 directly next to the black Toyota prior to Mendoza Hernandez shifting the vehicle into reverse and placing his foot on the gas pedal. In the video, I could see Agent 2 stepping

---

[8]     A review of the white Tesla video showed that prior to the black Toyota moving, the vehicle's front tires were indeed facing straight ahead.

[9]     Agent 2 did not state that he/she observed the black Toyota move forward which Agent 1 stated was the first movement of the vehicle after the traffic stop. Your affiant reviewed the original Tesla Y video which showed that the vehicle's initial movement involved the front wheels being steered to the left when it was originally facing straight ahead. The vehicle moved forward to the left for a short distance. A short time later, the vehicle shifted to reverse where the vehicle backed into Agent 1's F-150.

back approximately three steps as Mendoza Hernandez accelerates his Toyota backward in reverse. I also saw the front passenger fender swerve to the right and appear to move over the location where Agent 2 was standing on before Agent 2 took a few steps backward. Based on my training and experience, I believe that Agent 2 would likely have been struck by the black Toyota's front right fender had Agent 2 not taken a few steps back.

29. After Mendoza Hernandez put his Toyota in reverse and pushed the gas pedal, the Toyota's position was now such that Agent 2 was now directly in front of the vehicle, at the "12 o'clock" position, approximately two to three feet away from Agent 2. Before Mendoza Hernandez drove his vehicle, Agent 2 was directly to the right of the vehicle at the 2 o'clock position. After Mendoza Hernandez violently accelerated his Toyota backward into the front of the F-150, Agent 2 then drew his/her firearm. Before this moment, Agent 2 had not drawn his/her firearm. My review of the original Tesla Y video is consistent with Agent 2's statements about not drawing his/her firearm because, in the high-resolution video, I can see Agent 2 drawing his/her firearm only after the black Toyota had moved quickly in reverse and struck the F-150.

30. At this time, Agent 2 heard his/her colleagues giving commands to Mendoza Hernandez instructing him to "Stop, stop, stop." During this brief pause, Agent 2 believed that the situation had ended, thanked God, and believed that they would now be able to extract Mendoza Hernandez out of the vehicle. Agent 1 recalled that, while the black Toyota was momentarily stopped after hitting the F-150, no other agents had discharged their firearms prior to this point.[10]

31. After the pause, Agent 2 observed Mendoza Hernandez begin driving the black Toyota towards him/her and also heard the vehicle's engine "wind up." Agent 2 was approximately two or three feet away.[11] Agent 2 believed that he/she "was dead" and "done," because Mendoza Hernandez was driving the Toyota towards Agent 2 who was directly in front of the vehicle. At this moment, Agent 2 discharged approximately two to three "defensive rounds." These rounds were discharged in an

---

[10]     During an interview of Agent 1, he/she stated that he had discharged approximately two rounds after the black Toyota surged forward hitting Agent 1 and before it reversed into the F-150. My review of the white Tesla video confirmed that Agent 1 appears to have fired three rounds by this point in the interaction with Mendoza Hernandez.

[11]     After Agent 2 took a few steps back away from the reversing black Toyota and after drawing his/her firearm, Agent 2 took a few steps forward as well.

12

attempt to stop Mendoza Hernandez from driving the Toyota into Agent 2's body. Agent 2 believed that the two rounds he/she fired dissuaded Mendoza Hernandez from maintaining the same course of travel towards Agent 2 and that if he/she did not discharge the two rounds that he/she would have been run over.

32. Mendoza Hernandez's then drove the Toyota forward and to the left veering quickly in the direction of Agent 1. Agent 2 then discharged one more round in an attempt to protect his/her partner, Agent 1, by stopping Mendoza Hernandez from accelerating towards Agent 1. Agent 2 was also aware that Agent 1 discharged rounds from his/her firearm around this same time frame. Based on the speed with which Mendoza Hernandez drove his Toyota and hearing Mendoza Hernandez rev up the engine by pressing down on the accelerator, Agent 2 believed that Mendoza Hernandez had his foot all the way down on the gas pedal. Agent 2 described the manner in which Mendoza Hernandez drove as "aggressive" and "violent" in an attempt to escape "by all means necessary." He/she further believed that Mendoza Hernandez was driving at a high rate of speed because the vehicle continued passed Agent 1 fast enough that when Mendoza Hernandez hit the center median, the speed and force was great enough to cause the Toyota to "hop" the rock and concrete median.

33. When Mendoza Hernandez quickly accelerated forward and veered the Toyota to the left, Mendoza Hernandez's path was now aimed at hitting Agent 1. Agent 1 evaded being hit by Mendoza Hernandez by quickly moving to his/her right. According to Agent 2, he/she believed that if he/she and Agent 1 did not discharge their firearms and if Agent 1 did not move out of the path of the vehicle, that Mendoza Hernandez would have struck Agent 1 with the Toyota.

**D.    Interview of Agent 1 on April 10, 2026**

34. On or about April 10, 2026, I interviewed Agent 1. According to Agent 1, during the first contact with Mendoza Hernandez on April 7, Agent 1 identified him/her as working for immigration. Agent 1 asked for Mendoza Hernandez's driver's license, which he provided. Based on the driver's license and observation of Mendoza Hernandez's physical appearance, Agent 1 was able to positively identify the driver as the subject who they were trying to locate and arrest. The initial contact occurred in English, but the conversation switched to Spanish, which Agent 1 speaks fluently.

35. During the initial part of the stop, Mendoza Hernandez rolled the front driver's

side window approximately one-third of the way down. Agent 1 observed a phone,[12] possibly teal green in color, which was on a cell phone holder located or mounted on the Toyota's dashboard. Agent 1 did not observe the phone's screen as being on.[13] For approximately two to three minutes, Agent 1 and Mendoza Hernandez had a back-and-forth exchange in what Agent 1 described as communication going in "circles." This back-and-forth exchange pattern featured Agent 1 instructing Mendoza Hernandez to get out of the vehicle, Mendoza Hernandez not complying and, instead, responding that he wanted to call his wife before exiting the vehicle. Agent 1 told Mendoza Hernandez that he could indeed call his wife but first he would have to comply, get out of the vehicle first, and then he could speak to his wife after. However, Mendoza Hernandez refused to comply for a period of what Agent 1 believed was two to three minutes. In Agent 1's experience, subjects who comply would often get out of their vehicle within the first five seconds. As such, Agent 1 believed Mendoza Hernandez was intentionally not complying with Agent 1's requests.

36. Near the end of the two-to-three minute exchange, Agent 1 noticed that Mendoza Hernandez began looking around. In Agent 1's experience, Mendoza Hernandez's behavior was an indicator consistent with Mendoza Hernandez preparing himself to flee by looking to identify a means of escape. During the earlier portion of the two-to-three minute exchange, Agent 1 did not observe Mendoza Hernandez making any similar efforts to look around.

37. During the latter portion of this time frame, Agent 1 instructed Agent 3, whose black Nissan Pathfinder was parked directly in front of the black Toyota, to reverse his/her vehicle so that it would eliminate the space between the front bumper of Mendoza Hernandez's black Toyota and the rear of Agent 3's vehicle. This action was taken in order to discourage Mendoza Hernandez from

___

[12] I am seeking authorization in this warrant for a search of a black cell phone. Agent 1 stated the color of the phone he/she observed was possibly teal green. This operation occurred in the early morning hours, making visual identification of colors more difficult. It is possible that the phone sought in this affidavit is the same phone which Agent 1 observed. Further, I reviewed the high-resolution Tesla Y video which showed that after the black Toyota jumped the center median, numerous items were dislodged from the vehicle falling onto the road. The black phone your affiant is requesting authorization to search was found in this general vicinity on the eastbound side of Sperry Avenue.

[13] Although the phone's screen was not on, your affiant is aware that certain applications on phones allow them to conduct recordings without the phone's screen being turned on. As previously discussed, Mendoza Hernandez stated that he had dashcam footage which captured the incident. I believe his reference to dash cam video can be a reference to an actual dash cam or to the cell phone observed on the dashboard by Agent 1.

14

fleeing because, from Agent 1's perspective, Mendoza Hernandez had manifested significant signs of non-compliance and behavior consistent with an impending attempt to flee. Agent 3, who was on the passenger side of the black Toyota walked around toward the black Pathfinder, entered his/her vehicle, reversed the vehicle to approximately one foot from Mendoza Hernandez's front bumper, exited the vehicle, and walked back to the passenger side of the black Toyota to re-establish his/her position. Agent 1's observation and request for Agent 3 to reposition the Pathfinder, which is consistent with what Agent 4 recounted, demonstrates how long Mendoza Hernandez's non-compliance with Agent 1's commands was prolonging the stop. Based on my training and experience, I believe this action by Agent 3 (repositioning the Pathfinder in front of Mendoza Hernandez's Toyota) while the stop was still unresolved and ongoing and had already lasted for two to three minutes, indicates that Mendoza Hernandez had ample opportunity to turn off his vehicle, exit the Toyota, and deal with the agents, but he chose not to despite multiple opportunities to do so.

38. According to Agent 1, based upon Mendoza Hernandez's prolonged non-compliance, agents planned to extract Mendoza Hernandez from the vehicle. To effectuate the extraction, Agent 1 moved his/her position further to the front of the Toyota, leaning on the front driver's side fender facing Mendoza Hernandez. At this time, Agent 1 drew his/her firearm and pointed it through the front windshield downwards towards the lap area of Mendoza Hernandez. Agent 1 took this position to establish better officer presence,[14] obtain a better view of Mendoza Hernandez, to see Mendoza Hernandez's hands, provide coverage to his/her colleagues in case lethal force was used, and to ensure an angle to minimize the crossfire with his/her colleagues if they had to discharge their firearms. Agent 1 told me that his/her drawing of his/her firearm and positioning at the front driver fender were not done with an intention to discharge his/her firearm. Agent 1 said that his/her finger was not on the trigger of the firearm but, instead, was placed on the "side rail."

39. According to Agent 1, Agent 3 proceeded to use a window punch to break the front passenger window. Agent 1 heard the breaking of the glass and opening of the front passenger

---

[14] Officer presence is a term used by law enforcement officers to describe visible, authoritative appearance and demeanor of a law enforcement officer to influence behavior and help gain voluntary compliance without the use of force.

15

door.  Agent 1 saw broken glass in his/her periphery.  Around this time, Agent 1 saw Mendoza Hernandez reach for the shifter.  Agent 1 repeatedly instructed him, "Don't move."  Agent 1 heard Mendoza Hernandez revving the Toyota's engine from pressing down on the vehicle's gas pedal.  When Agent 1 heard Mendoza Hernandez revving the engine, the Toyota was stationary because Mendoza Hernandez had not shifted the car into drive.  That quickly changed.  According to Agent 1, Mendoza Hernandez then shifted the Toyota into drive and hit the gas pedal causing the car to surge forward approximately six to eight inches.[15]  When Mendoza Hernandez drove the Toyota forward, Agent 1's body was leaning on the front driver's side fender.  Mendoza Hernandez's sudden forward surge in the Toyota caused Agent 1's body to be pushed off of the Toyota's front fender.[16]

40.     Agent 1 recalled that no shots were discharged before Mendoza Hernandez caused the Toyota to drive forward.  After Mendoza Hernandez drove the Toyota forward, Agent 1 stated he/she discharged approximately two shots; one was shot low because the firearm was originally angled downwards for officer safety and the other shot was aimed approximately at Mendoza Hernandez's upper center of mass.  At this time, Agent 1 did not hear any other agents discharge their firearms.  Agent 1, fearing for his/her life and those of his/her colleagues shot Mendoza Hernandez to stop Mendoza Hernandez's forward surge in the Toyota and the shots were taken in order to stop Mendoza Hernandez..  According to Agent 1, he/she shot believing that the continual movement of the vehicle would pose a danger to Agents 2 and 3, who were on the passenger side where the front passenger door was open.  The open door would pose a risk of dragging the agents along while Mendoza

---

[15]     In prior affidavits, I estimated that the distance the vehicle moved was approximately one foot.

[16]     I reviewed the Tesla Y video and found it to be consistent with Agent 1's observations.  As the Tesla Y drives towards the scene of the traffic stop, I can see Agent 1 leaning against the fender over the front windshield.  I can see Mendoza Hernandez has the black Toyota's front tires facing forward.  The vehicle's taillights are along on with the flashing hazard lights.  Based on my training and experience, I believe that at this time the vehicle was not moving and Mendoza Hernandez had the Toyota in the "park" or neutral driving position.  As the Tesla Y gets  closer in the video, Mendoza Hernandez's  brake lights momentarily turn on, consistent with Mendoza Hernandez placing his foot on the brake pedal.  I believe it was at this time that Mendoza Hernandez shifted his vehicle into drive.  Around the same time, Mendoza Hernandez must turn the steering wheel to the left because I can see the front driver's side wheel turn to the left. Mendoza Hernandez then accelerates causing the Toyota to surge forward  and to the left.  I estimate the distance moved was approximately one foot while Agent 1 estimated the distance as six to eight inches.  I can see that Mendoza Hernandez's action in driving the Toyota forward causes Agent 1 to be pushed off the vehicle and moving backwards.

Hernandez drove the Toyota. Agent 1 believed that Mendoza Hernandez surged the vehicle forward in order to effectuate an escape.

41. Immediately after surging the Toyota forward, Mendoza Hernandez then shifted the car into reverse at a high rate of speed. Mendoza Hernandez's rapid shifting of the Toyota into reverse and pressing the gas pedal, caused the rear of the vehicle to swerve dramatically into the street.[17] Agent 1 heard Mendoza Hernandez revving the engine up as he put the car in reverse. According to Agent 1, Mendoza Hernandez's actions caused the Toyota to move backward quickly and violently and caused a loud collision when Mendoza Hernandez smashed the Toyota into the front of Agent 1's F-150, pinning the front passenger door between the F-150. Mendoza Hernandez's actions caused the Toyota's passenger door to "flatten out," meaning open all the way toward the front of the Toyota as far as the hinges could reach without the door falling off.

42. After Mendoza Hernandez smashed the back of his Toyota into the front of the F-150, Agent 1 described being in shock and awe. Agent 1 waited and "reassessed" to see what Mendoza Hernandez's next move would be. In the moment, Agent 1 wondered whether Mendoza Hernandez would continue backing up, or if the vehicle was inoperable, or whether Mendoza Hernandez was fatally wounded. At this time, Agent 1 did not anticipate the possibility that Mendoza Hernandez would shift the Toyota into drive, press the gas pedal, and speed forward directly at the agents. I reviewed the Tesla Y video observing Agent 1 lower his/her firearm momentarily in this moment as Agent 1 is reassessing what Mendoza Hernandez may do next. I can see Agent 1 then raise his firearm aiming it in the direction of Mendoza Hernandez.

43. At this time, both Agents 1 and 2 were in a position where their bodies were positioned between the front of Mendoza Hernandez's Toyota and the back of Agent 3's black Pathfinder. Agent 1 did not want Mendoza Hernandez to drive his Toyota in Agent 1's body and cause Agent 1 to be crushed between the Toyota and the Pathfinder – Agent 1 thus quickly moved to his/her right to get out of Mendoza Hernandez's path of flight. Agent 1 heard Mendoza Hernandez revving the Toyota's engine and saw the Toyota's front wheels were now turned at an extreme angle to the left in a

_____

[17] This description of the reversing of the vehicle is consistent with your affiant's observations based on the Tesla Y video.

17

path that would take Mendoza Hernandez's car directly into Agent 1's body. Agent 1 believed that Mendoza Hernandez wanted to run down the agents with his car based on the wheel angle and the speed with which he was accelerating to move the car forward.

44. When Mendoza Hernandez accelerated his Toyota forward toward Agent 1's body, Agent 1 shot five to six rounds while side-stepping to the right out of the path of the moving vehicle. Agent 1 believed that, had he/she not moved out of the path of Mendoza Hernandez's vehicle and fired those shots, he/she would have been run over by Mendoza Hernandez's car. I reviewed the Tesla Y footage and believe that, if Agent 1 had not moved out of the path of Mendoza Hernandez's vehicle as he accelerated it forward, Mendoza Hernandez would have struck Agent 1's body based on the car's path of travel. In all, Agent 1 stated that he/she shot approximately two rounds when the vehicle surged forward and five to six rounds after the vehicle struck the F-150 and then began to accelerate forward.[18]

45. Consistent with Agent 1's recollection of a cellphone mounted on or near the dashboard within Mendoza Hernandez's Toyota at the outset of the traffic stop on April 7, on April 14, 2026, an FBI agent confirmed that there is a cell phone holder mounted on the dash, attached to a vent under the infotainment screen inside of Mendoza Hernandez's Toyota. There is currently no cellphone within that holder and no cellphone is visible inside the Toyota from the outside looking in. I believe that when Mendoza Hernandez accelerated forward and over the rock and concrete median into oncoming traffic, the cellphone that Agent 1 saw mounted inside the Toyota at the time of the stop may have become dislodged and exited the Toyota on to Sperry Avenue, where it was later collected as evidence.

---

[18] I reviewed the white Tesla Y video to identify when shots were fired by agents by looking for signs of muzzle blasts from the agents' discharging of their firearms. Muzzle blast is a term for the high-pressure gases exiting a barrel when a shot is fired. This muzzle blast is visible especially in slowed down video. The Tesla Y video does not capture the entirety of the traffic stop. However, a careful review of the video for observable muzzle blasts from Agent 1's firearm, shows that the first observable muzzle blast occurred just after the black Toyota moved forward to the left striking Agent 1. A second muzzle blast occurred immediately after the black Toyota began to reverse. As the black Toyota continued reversing but prior to hitting the F-150, a third muzzle blast can be seen and, immediately after, a long piece of black trim flies up from the Toyota getting thrown approximately ten feet into the air. Agent 1 then gets blocked by the path of the black Toyota with Agent 1 reappearing with his/her firearm lowered.

18

46. This affidavit respectfully requests authorization to search the black Toyota C-HR for evidence of the offense (Attachment A-1). Based on my training and experience and Mendoza Hernandez's spontaneous statement at the hospital that he had a dash cam recording the interaction, as well as Agent 1's observation that he/she saw a cellphone mounted or near the dashboard at the beginning of the stop on April 7 and confirmation that the Toyota does, in fact, have a cell phone holder mounted to the dashboard, I believe the vehicle may contain a dash camera with audio and/or video recordings of the incident, including statements made by Mendoza Hernandez and the involved officers, which may reflect his intent and state of mind.

47. I am also aware that Agents 1 and 2 discharged their firearms during the incident, and I believe the vehicle may contain evidence indicating when, where, and how many rounds were fired. Although this affidavit seeks authorization for an investigation involving the assault of federal officers, I believe that when, where, and how many rounds were fired is material to this investigation. A search of the vehicle for evidence of the shots fired by agents, including trajectory analysis and an examination of projectile fragments that are contained in the vehicle including those that struck and dislodged, and those that are still currently lodged in the vehicle or personal belongings in the vehicle, along with the video evidence showing the positions of agents when they fired shots can help your affiant better identify evidence either confirming that Mendoza Hernandez's vehicle moved prior to shots fired or after shots were fired. The sequence of whether Mendoza Hernandez moved his vehicle first or if agents shot their firearms first is material to this investigation.

48. I am also aware that at least one person has provided statements to the media claiming that she witnessed agents firing shots before Mendoza Hernandez drove his Toyota forward, backward, and then forward again. I attempted to conduct an interview with this person but have not been able to meet with the person. I do intend to attempt to interview this person based upon public comments she made on a news program. In the meantime, this claim, and the evidence contained within Mendoza Hernandez's Toyota, are important to determine how Mendoza Hernandez operated his vehicle in response to the agents, what angles the shots entered the vehicle and where the shots and bullet fragments ended up within the Toyota. As such, I believe that a search of the vehicle for projectiles and a trajectory analysis, which would help identify where shots were fired, where they

19

entered and exited a vehicle, along with other evidence, will help determine whether the person's statements to the press about the circumstances of the stop on April 7, 2026, can be corroborated or verified.

49. I also seek authorization to search the black cellular phone discovered on the south sidewalk of Sperry Avenue, Patterson, California, near the incident scene believed to have belonged to Carlos Ivan Mendoza Hernandez, described in further detail in Attachment A-2. As discussed previously, on April 10, 2026, I interviewed Agent 1 who observed a cell phone, possibly teal green in color, on a phone holder or mount on the dashboard of Mendoza Hernandez's Toyota. Consistent with Agent 1's recollection of a cellphone mounted on or near the dashboard within Mendoza Hernandez's Toyota at the outset of the traffic stop on April 7, on April 14, 2026, an FBI agent confirmed that there is a cell phone holder mounted on the dash, attached to a vent under the infotainment screen inside of Mendoza Hernandez's Toyota. There is currently no cellphone within that holder and no cellphone is visible inside the Toyota from the outside looking in.

50. I also know that items were dislodged from the black Toyota as it drove over the center rock and concrete median on the eastbound lanes of Sperry Avenue, as is apparent in the Tesla Y video and Figure 5 above. In this general vicinity, the FBI found a black cell phone. I submit there is probable cause to believe that this phone may have been the phone which Agent 1 observed mounted on the dashboard of Mendoza Hernandez's Toyota during the stop. This, coupled with Mendoza Hernandez's statements at the hospital that the incident was recorded, makes me believe that Mendoza Hernandez may have been able to record or photograph some portion of his interaction with the agents on the morning of April 7.

51. According to Agent 4, during the initial traffic stop encounter, Mendoza Hernandez repeatedly stated that he wanted to make phone calls, suggesting that he may have used or attempted to use the phone to contact others. I believe the phone may provide evidence of his intent and actions during the incident. He may have also attempted to record his encounter with agents, as is common in modern encounters with law enforcement officers when subjects seek to document their interactions with law enforcement.

52. The evidence items your affiant is requesting authorization to be searched (the

20

Toyota C-HR and black cell phone) have been seized by the FBI and are being stored at a secure location in Roseville, California. For items A-1 and A-2, I believe there is a fair probability that the narrowly-tailored list in the corresponding Attachments B-1 and B-2 will be found in the items to be searched.

### IV.    CONCLUSION

53.    For the reasons set forth in this Affidavit, I respectfully request the issuance of a search warrant authorizing the search of the items described in Attachment A-1 and A-2 and the seizure of the items described in Attachment B-1 and B-2.

54.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

Respectfully submitted,

/s/ Brian Toy

Brian Toy
FBI Special Agent

Subscribed and sworn to before me on:    April 14, 2026

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

/s/*Jason Hitt*
Assistant United States Attorney Jason Hitt:

21

## ATTACHMENT A-1
### Property to be Searched

One black Toyota C-HR, CA 8WVR144, driven by Carlos Ivan Mendoza Hernandez on or about April 7, 2026.  The vehicle is registered to C.M. at a residence located in Patterson, California.  The vehicle is currently secured at the FBI Sacramento Division office located at 2001 Freedom Way, Roseville, California.

## ATTACHMENT A-2
### Property to be Searched

One black cell phone recovered on the south sidewalk of Sperry Ave near the incident scene believed to have belonged to Carlos Ivan Mendoza Hernandez.  The item is currently secured at the FBI Sacramento Division office located at 2001 Freedom Way, Roseville, California.

## ATTACHMENT B-1
### Items to be Seized from Attachment A-1

The items to be seized from the Attachment A-1 are any evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Section 111(b), by Carlos Mendoza Hernandez, on April 7, 2026, described as follows:

1. Any and all targets or objects that have been shot by a firearm, including vehicle windows, seats, trim, dashboard, doors, and items that are not a part of the vehicle but are within the vehicle such as bags, cell phones, and personal belongings as well as trajectory analysis of those objects.

2. Any and all fired cartridges, ammunition, projectiles which are within the vehicle, dislodged within the vehicle, lodged or embedded, fired ammunition components to include bullet fragments obtained through bullet trajectory analysis and shell casings within the vehicle or personal items within the vehicle.

## ATTACHMENT B-2
### Items to be Seized from Attachment A-2

The items to be seized from the Attachment A-2 include any evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Section 111(b), by Carlos Mendoza Hernandez, on April 7, 2026, described as follows:

1. Call logs, contact lists, text messages, and multimedia messages from, on or about April 7, 2026 related to the traffic stop.

2. Photographs, videos, or recordings related to the traffic stop on April 7, 2026.

3. Location data, GPS information, and application data to demonstrate the user's location on the morning of April 7, 2026.

4. Any evidence of communications from the time Mendoza Hernandez left his residence on the morning of April 7, 2026, or during the traffic stop, or during Mendoza Hernandez's flight from law enforcement on April 7.

5. Evidence of user attribution showing who used or owned the phone described in Attachment A-2 at the time the stop on April 7, 2026.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this Attachment B-2. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br>One black Toyota C-HR, CA 8WVR114, currently secured<br>at the FBI Sacramento Division office located at 2001<br>Freedom Way, Roseville, California; and<br><br>One black cell phone recovered on the south sidewalk of<br>Sperry Ave near the incident scene believed to have<br>belonged to Carlos Ivan Mendoza Hernandez, currently<br>secured at the FBI Sacramento Division office located at<br>2001 Freedom Way, Roseville, California. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No.      2:26-sw-0331 AC |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENTS A-1 and A-2, attached here and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENTS B-1 and B-2, attached here and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ April 28, 2026 _____ *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     April 14, 2026 @ 4:45 p.m.

City and state:          Sacramento, California

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| **Certification** |
|---|

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____ _____
Signature of Judge                                  Date